# UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

DANIEL LEROY STRICKER and
TAMMY MARIE STRICKER,

       Debtors.

_____/

Case No. GT 07-02374
Chapter 7

FLAGSTAR BANK, FSB,

       Plaintiff,

v.

DANIEL LEROY STRICKER and
TAMMY MARIE STRICKER,

       Defendants.

_____/

Adversary Proceeding No. 07-80217

## OPINION REGARDING DISCHARGEABILITY OF DEBT

<u>Appearances:</u>

Paul I. Bare, Esq., Traverse City, Michigan, for Debtors-Defendants.

Sandra L. Jasinski, Esq., Cheboygan, Michigan, for Plaintiff Flagstar Bank, FSB.

## I. INTRODUCTION.

In this adversary proceeding, Plaintiff, Flagstar Bank, FSB ("Flagstar") seeks a determination that its state court deficiency judgment of more than $214,000 against Debtor-Defendants, Daniel Stricker and Tammy Stricker ("Strickers"), is not dischargeable in the Strickers' bankruptcy case based on 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B).[1]

---

[1] All future references to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, shall be cited as "§ _____."

The court conducted a bench trial over two days.[2]  After proofs were concluded, the court held a conference with counsel for the parties to request additional documentary evidence to clarify certain ambiguous information.  Following that conference, with consent of the parties, and pursuant to the court's order of March 18, 2009, additional documents were received and admitted into evidence.

For the reasons stated below, the court finds for the Strickers on the issue of nondischargeability.  While the Strickers made a few misrepresentations to Flagstar, the court determines that to the extent that Flagstar may have relied upon the same, under these rather unique facts, any reliance was neither justifiable nor reasonable.  In addition, and importantly, the court concludes that the misrepresentations, and Flagstar's reliance, to the extent it existed, was not the proximate cause of Flagstar's loss.

## II.  JURISDICTION.

This court has jurisdiction over this bankruptcy case.  28 U.S.C. § 1334.  This bankruptcy case and all related proceedings have been referred to this bankruptcy court for decision.  28 U.S.C. §157(a) and L.R. 83.2(a) (W.D. Mich.).  This is a core proceeding and the court may enter a final order.  28 U.S.C. § 157(b)(2)(I) (dischargeability of debt).  This opinion constitutes the court's findings of fact and conclusions of law.  FED. R. BANKR. P. 7052.

---

[2] References to the trial transcript shall be designated "Trans. at _____." Exhibits are identified "Exh. _____."

## III. FACTS.

During the trial the court heard five witnesses.[3] All were credible except as may be stated to the contrary.

The Strickers are a 20-year married couple with two children who have lived for several years in Lake Ann, outside Traverse City, Michigan. (Trans. at 170-172; Exh. 4.) Daniel Stricker is a high school graduate who has been employed by a Traverse City company as a draftsman since approximately 1985. (Trans. at 51-52; Exh. 4.) Tammy Stricker has an associate's degree in nursing and has worked as an oncology nurse since approximately 1986. (Trans. at 170; Exh. 4.)

In the mid-1990s, the Strickers met James Keyton ("Keyton") through a junior hockey program in which their children participated. Keyton was an ex-National Football League player living with his wife, Diane, and their children in the Traverse City area. (Trans. at 171.)

Keyton was a mortgage broker and real estate developer controlling and operating several corporations in Traverse City, including Almerica Mortgage Corporation ("Almerica"); Keyton Development Corporation ("Keyton Development"); and Keyton's Development Corporation ("Keyton's Development"). (Trans. at 18-20, 29-31; Exhs. 2, 4, 28 & 32; Corporate filings with the State of Michigan.)[4]

---

[3] The witnesses were: Todd Heller of the Grand Traverse Sheriff's Department, Daniel Stricker, Tammy Stricker, Michael Wilkie of Flagstar and Michael Rieser of Flagstar. The missing witness was James Keyton whose dark shadow fell over the entire trial.

[4] After notice and without objection of the parties, the court takes judicial notice of the public filings with the State of Michigan of Almerica, Keyton Development and Keyton's Development revealing that, at all relevant times, they operated from the same address, 757 E. Silver Lake Road South, Traverse City, Michigan 49684, and that Keyton was an incorporator, the president, the sole officer and the registered agent of each corporation.

Flagstar is a lender with corporate offices in Troy, Michigan, making mortgage loans to individual borrowers, such as the Strickers, and to developers, such as Keyton's Development. Flagstar utilized mortgage brokers, such as Almerica, rather than its own employees, to originate and close 90% of its residential mortgages. (Trans. at 216-217.)

After Keyton knew the Strickers for approximately four years, he proposed to the Strickers that they purchase a rental property in Lansing, Michigan ("Lansing Property"). The Strickers did so in June, 1999 through a mortgage loan from Almerica to them. Keyton, as president of Almerica, then assigned the mortgage to Flagstar. (Trans. at 173-174; Exh. 1 & 2.) Approximately two years later, the Lansing Property was sold, through a sale arranged by Keyton, and the mortgage held by Flagstar was paid off. (Exh. 13.) The Strickers made a $3,000 profit from the resale. (Trans. at 56-57.)

In July 1999, Keyton then proposed that the Strickers take out a loan to build a so-called "spec house" ("Windcrest House") in the Morgan Hill Estates condominium development, a project of Keyton's through his corporation, Keyton's Development. (Trans. at 64-70; Exh. 4 & 45.) Keyton's Development was also to be the builder of the Windcrest House. Upon completion, the house was to be resold with the profit divided between Keyton and the Strickers. The Strickers complied with Keyton's idea and signed a loan application for $233,500 which was prepared by Keyton's other company, Almerica. Almerica then sent the application to Flagstar which approved the loan, but that loan was

---

Massachusetts v. Westcott, 431 U.S. 322, 323, 97 S. Ct. 1755, 1756 (1977); Illinois Central R.R. v. Tennessee Valley Auth., 445 F.2d 308, 310 (6th Cir. 1971); United States v. Harris, 331 F.2d 600, 601 (6th Cir. 1964); United States ex rel. Dingle v. BioPort Corp., 270 F.Supp.2d 968, 972 (W.D. Mich. 2003), aff'd, 388 F.3d 209 (6th Cir. 2004). The record contains several documents introduced by Flagstar all of which Keyton signed as "president" of these entities. (E.g., Flagstar Exh. 2, 4, 28 & 32.)

4

never closed. (Exhs. 4 & 5; Trans. at 232.) Keyton buttressed his application by furnishing Flagstar with a $274,000 appraisal dated October 22, 1999 showing the owner of the lot to be Keyton's Development. (Exh. 37.)

At approximately the same time during July, Keyton orchestrated a $50,000 home equity loan to the Strickers on their Lake Ann residence for the purpose of lending the $50,000 to one of Keyton's entities. (Trans. at 68, 158, 178 & 206.) This money was not repaid to the Strickers.

Approximately four months later, in November, 1999, Keyton obtained a $170,000 loan from Flagstar to Keyton's Development granting Flagstar a mortgage (Exh. 45) on the Morgan Hill Estates development, including the lot for the Windcrest House. Flagstar recorded the mortgage.

Sometime late in 2000 or early in 2001, Keyton prepared an undated and unsigned loan application, allegedly on behalf of the Strickers, for a $320,000 loan to build the Windcrest House and submitted it to Flagstar ("Second Loan Application"). (Exh. 9.) Keyton supported the Second Loan Application by supplying Flagstar with a Building Construction Agreement dated October 23, 2000 showing a total price for the property as $356,000 ($75,000 for the lot and $281,000 for the improvements to be constructed). (Exh. 32; Trans. at 325.) Keyton executed that agreement as the "president" of the builder. While it purported to be signed by the Strickers, the Building Construction Agreement was never shown to them before trial and, at least, Mrs. Stricker's signature appears totally different (i.e., a forgery) from her other undisputed signatures. (Exh. 32.)

On February 1, 2001, Flagstar telefaxed a "Credit Denial" to Keyton at Almerica declining the Second Loan Application but suggesting that it *would* approve a loan at an

80% (rather than 90%) of the $356,000 alleged total cost. The Credit Denial was not sent to the Strickers but only to Keyton. (Exh. 11; Trans. at 240-242.)

The Credit Denial, with invitation to apply for an 80% loan, sparked a series of communications *solely* between Keyton and Flagstar. Keyton, over the next few days, gave Flagstar a number of documents ("Revised Documents") (many of which were forged by Keyton), including:

1.  a purported September 1, 2000 lease by a Mary Ann Gilbert of one-half of the Lansing Property (Exh. 35);

2.  a purported December 1, 2000 lease by Bryan Kuhn of the other one-half of the Lansing Property (Exh. 35);

3.  a purported January 1, 2001 lease by Mike and Sally Buchannon of the Strickers' Lake Ann residence (Exh. 36);

4.  a purported "gift letter," allegedly signed by one of the Strickers' grandmothers, allegedly agreeing to loan the Strickers $35,000 (Exh. 30);

5.  a December 2, 1999 Escrow Acknowledgment (Exh. 39);

6.  a July 15, 1999 Construction Loan Draw Agreement (Exh. 39);

7.  a purported "Verification of Deposit" dated January 12, 2001 from Old Kent Bank allegedly showing a $63,815.24 balance in the Strickers' bank account (Exh. 34); and

8.  a July 14, 2000 appraisal by Veri-Tech Appraisal of the house to be constructed by Keyton (Exh. 33).

At trial, the Strickers were shown the Revised Documents. The Strickers had not previously seen the purported leases, the "gift letter," or the Verification of Deposit. (Trans. at 374-81 and 384-90.)

The Revised Documents given by Keyton to Flagstar are highly suspect and unusual in a number of instances.

- The three purported leases are all less than one page long and do not bear a signature line for Mrs. Stricker, although she was the known joint owner of the properties.

- The Escrow Acknowledgment and the Construction Loan Draw Agreement both predate the alleged new loan application by *more than a year*.

- The Verification of Deposit requests verification of a $10,883.66 savings account balance but purportedly has the depository bank verifying that the same account has an actual balance of $63,815.24. The signature lines for the Strickers authorizing the release of the information are blank.

- The first page of the July 14, 2000 appraisal sets the appraised value at $356,000 for the to-be-built Windcrest House but, later in the same appraisal, a second valuation letter appears from the same appraiser, also dated July 14, 2000, setting the value at only $308,000. (This is extremely contradictory.)

On February 6, 2001, Flagstar sent Keyton its Loan Purchase Commitment for a $275,000 loan. (Exh. 31.) The next day, on February 7, 2001, the Strickers met with Keyton at his office. They signed a $275,000 Loan Application (Exh. 12). At the same time, the loan was closed by Keyton, with the Strickers signing the note, mortgage and

other related documents.  (Exhs. 14 & 15.)  The *sole* representative of Flagstar at the closing was Keyton.  (Trans. at 89, 195 & 208.)

It is unclear to what extent the February 7, 2001 Loan Application was complete at the time the Strickers signed it.  (Trans. at 86-87, 183 & 386-87.)  However, in other documents executed by the Strickers at closing, they represented that the Windcrest House, upon completion, would be their principal residence (Exhs. 15 & 17).  The Strickers never intended to move into the Windcrest House and always intended it to be a spec house to be sold to a third party.  (Trans. at 64, 73 & 182.)  The court believes that this is the major misrepresentation made by the Strickers; they should not have signed this document.

Flagstar was aware that Keyton, as Keyton's Development, was the seller of the lot for the Windcrest House (Exhs. 4, 33 & 45) as well as the contractor who was building the Windcrest House (Exhs. 32 and 40).  Flagstar knew that the Strickers had made no down payment on the lot and likewise had made no payments toward the construction.  (Trans. at 345; Exh. 31.)

On closing of the loan, Keyton was owed (as Keyton's Development) the lot purchase price of $75,000 and the first construction draw of $176,447 (with the remaining $105,000 to be paid to Keyton on later draws), as well as (as Almerica) $575 in costs. Keyton (as Almerica) was also to receive $6,187.50 from Flagstar as his fee for originating the loan, which amount, however, did not come from the loan proceeds.  (Exh. 28.)  The Strickers were not disbursed any funds from the transaction.

At the same time he was brokering the Strickers' loan, Keyton was also negotiating, for himself, at least eight personal loans, secured by mortgages, from Flagstar (the "Keyton

Personal Loans"). The Keyton Personal Loans totaled in excess of $300,000 and all closed between February 19 and March 9, 2001.

Between the closing of the loan and October, 2003, the Strickers received a number of notices from Flagstar, at various times, indicating that it was necessary to extend the construction loan, that there were unpaid taxes on the Windcrest House, or that a payment was overdue. They gave these notices to Keyton who resolved each issue directly with Flagstar. (Dep. Exhs. 15-36; Trans. at 129-55 & 192-98.)

On June 10, 2002, Keyton forged a deed purportedly from the Strickers conveying the Windcrest House back to Keyton's Development. (Exh. 18.) The Strickers had no knowledge of Keyton's deed. (Trans. at 206-07 & 122-24.)

On November 22, 2002, Keyton sold the Windcrest House to a third party for $394,000. (Flagstar's First Amended Complaint, ¶ 13.) The Strickers had no knowledge of the sale and received *nothing* from it. As a result of such sale, Keyton acquired possession of a $275,000 check that *should have been used to pay the Strickers' mortgage debt to Flagstar.* The money that should have paid the mortgage was used for different purposes. Keyton paid it to Flagstar but, apparently on his instructions, Flagstar applied the funds to the Keyton Personal Loans (Trans. at 161-63 & 206-08; Flagstar First Amended Complaint, ¶ 14; Exh. 55), which had an aggregate balance of approximately $298,000.

Eventually, in November, 2003, the Grand Traverse County Sheriff's Office began a criminal investigation of Keyton and his companies. Keyton finally was arrested and charged with a number of crimes relating to his mortgage brokerage and development businesses. On July 30, 2004, Keyton pled guilty to uttering and publishing and, thereafter,

was incarcerated. As part of his sentence, he was ordered to make restitution of $236,000 to the Strickers and $350,000 to Flagstar. (Trans. at 15-28; Exhs. A & B.) Based upon Keyton's plea bargain, and the *two* restitution obligations, one may readily conclude that *both* the Strickers *and* Flagstar were victims of Keyton's wrongdoing.

Flagstar then instituted suit in the Leelanau County Circuit Court against the Strickers and National City Mortgage to determine the priority of its mortgage on the Windcrest House, to foreclose the mortgage, and to recover on the Strickers' note. It obtained a judgment on January 19, 2006 establishing its first mortgage position and allowing it to foreclose the same. Following the foreclosure sale, Flagstar obtained a deficiency judgment against the Strickers in the amount of $214,709.78. (Exh. 23 & 24.)[5]

Throughout the entire loan process, Keyton was the only representative of Flagstar dealing with the Strickers. Keyton prepared the loan applications. Keyton forwarded them to Flagstar. Flagstar made all requests for supplemental documents to Keyton, not to the Strickers. Keyton answered Flagstar's requests. Keyton was the sole representative of Flagstar at the loan closing. Post-closing, the Strickers met only with Keyton. All communications with Flagstar were handled by Keyton. (Trans. at 89, 142, 195, 209, 302-03 & 366.) It is curious to this court why no bank employee ever directly met the Strickers. Why would Flagstar communicate with Keyton rather than the Strickers?

---

[5] This deficiency judgment seemed very high to the court but apparently the house value was diminished by subsequent mold issues.

## IV. DISCUSSION.

A.   Selected Legal Elements Necessary to Prove Fraud or False Financial Statement Nondischargeability.

Flagstar alleges that the Strickers made several misrepresentations to it upon which it relied to make the mortgage loan.   Flagstar claims that the Strickers' debt to it is nondischargeable under §§ 523(a)(2)(A) and 523(a)(2)(B).   Section 523(a)(2)(A) applies to misrepresentations "other than a statement respecting the debtor's or an insider's financial condition." Section 523(a)(2)(B) applies to written misrepresentations "respecting the debtor's or an insider's financial condition."

Regardless of the subsection:

" . . . the creditor must prove that the debtor obtained money through a material misrepresentation that at the time the debtor knew was false or made with gross recklessness as to its truth.  The creditor must also prove the debtor's intent to deceive." Atassi v. McLaren (In re McLaren), 990 F.2d 850, 852 (6th Cir. 1993).

Moreover, the creditor must prove that it relied upon the false representation, either "justifiably" under § 523(a)(2)(A), or "reasonably" under § 523(a)(2)(B).  Field v. Mans, 516 U.S. 59, 61, 116 S.Ct. 437, 439 (1995); Willens v. Bones (In re Bones), 395 B.R. 407, 431 (Bankr. E.D. Mich 2008).  The creditor also must prove that "its reliance was the proximate cause of [the] loss."  Rembert v. AT&T Universal Card Services, Inc. (In re Rembert), 141 F.3d 277, 281 (6th Cir. 1998); Longo v. McLaren (In re McLaren), 3 F.3d 958, 961 (6th Cir. 1993); Atassi v. McLaren (In re McLaren), 990 F.2d 850, 852 (6th Cir. 1993).

The creditor must prove each and every element by a preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279, 291, 111 S.Ct. 654, 661 (1991); Rembert, 141 F.3d at 281.

11

Exceptions to discharge, including the exceptions under § 523(a)(2), "are to be strictly construed against the creditor." Rembert, 141 F.3d at 281; Manufacturer's Hanover Trust v. Ward (In re Ward), 857 F.2d 1082, 1083 (6th Cir. 1988).

B.    Material Misrepresentations.

Without question, the Strickers made at least one material misrepresentation to Flagstar. Without question, the Strickers falsely represented that their intention was to occupy the Windcrest House as their primary residence. The testimony of the Strickers is that they always intended the Windcrest House to be a spec house. They never intended to occupy it. They always intended that the house, once built, would be sold to a third party. Their statement to the contrary in the Mortgage and the Occupancy Agreement was a misrepresentation.

Much less clear are the alleged misrepresentations concerning their financial condition. Many of these representations, such as the purported leases of the Lansing Property and the Lake Ann residence, the "gift letter" and the purported verification of bank balance at Old Kent Bank, were based upon false documents prepared by Keyton and without the knowledge of the Strickers. However, it is also clear that the Strickers paid little or no attention to the loan application or other loan documents and either signed the documents in blank or in only a partially completed manner.

"A [financial] statement is materially false if the information offers a substantially untruthful picture of the financial condition of the debtor that affects the creditor's decision to extend credit." Insouth Bank v. Michael (In re Michael), 265 B.R. 593, 598 (Bankr. W.D. Tenn. 2001). The Strickers' actions in executing these documents containing known

misrepresentations, or executing the documents in blank, satisfy the element that material misrepresentations were made by them to Flagstar.

C.    Intent.

The issue of intent, particularly on the part of Tammy Stricker, is much less clear. The Strickers are not financially sophisticated. Neither Daniel nor Tammy Stricker ever met any representative of Flagstar *except for Keyton*. Keyton prepared all of the loan applications. Keyton responded to all requests for additional information from Flagstar. Keyton handled all communications with Flagstar. Keyton was Flagstar's sole representative at the closing of the loan. Keyton *was* Flagstar as far as the Strickers were concerned.

Because Keyton was well aware of the Strickers' intentions and financial condition and because Keyton was, insofar as the Strickers reasonably believed, Flagstar's representative in originating, processing and closing the loan, it is very difficult to believe that the Strickers had any subjective intent to deceive the bank. As Keyton told Tammy Stricker, *he* represented the bank. Because, throughout the entire process, neither she nor her husband met any other representative of Flagstar, this court credits her testimony that Keyton was Flagstar's agent and that Tammy Stricker was not intending to mislead anyone including Flagstar.

It has long been held that if a creditor's agent misleads the debtor into signing a false statement or signing a statement in blank, the element of intent is lacking. International Harvester Co. v. Carlson, 217 F. 736 (8th Cir. 1914) (false financial statement nondischargeability action under § 14 of the prior Bankruptcy Act). As that court stated,

> [The debtor] testifies that he made a full disclosure to the objecting
> creditor's agent, and depended upon that agent to enter the facts

> according to such disclosure. The [debtor] signed the statement without reading it, and probably without being able to understand its provisions. To be a ground for denying the discharge the written statement must be knowingly and intentionally untrue . . . . But if he [the debtor] is misled into signing an untrue statement by the creditor's own agent, in whom he had a right to rely, the statement is not "false" within the meaning of the statute.

International Harvester, 217 F. at 739-40.

However, under these facts, it is unnecessary for the court to now make any explicit and difficult determination regarding the intent of either of the Strickers. It is also not necessary to decide which of the alleged misrepresentations must be evaluated under the "justifiable" reliance standard or the "reasonable" reliance standard. As discussed below, Flagstar has failed to adequately prove its asserted reliance under either standard.

D.    "Justifiable" or "Reasonable" Reliance.

To attempt to prove its nondischargeable debt allegations, the gist of Flagstar's characterization is:

1.    A greedy couple (the Strickers) conspire with the crook (Keyton) to trick Flagstar into making an unwarranted loan to them.

2.    The mortgage brokerage firm which originated the loan (Almerica), which Keyton both owned and was employed by, had been carefully approved by Flagstar -- but Keyton, as a mere employee of Almerica, was basically unknown to the bank. As one of Flagstar's witnesses testified:

> I believe the -- brokerage or the correspondent [Almerica] that he [Keyton] worked with was approved through Flagstar. So we don't necessarily go out to that brokerage and find out who all the loan officers are for them. We just approve that particular broker and make them determine on who is approvable on their sales staff.

14

(Trans. at 218.)[6]

3.      The loan applied for was a run-of-the-mill, garden-variety mortgage loan which Flagstar had no reason whatsoever to investigate or question.

Other than by ignoring all of the facts, even a cursory review of the totality of transactions reveals quite another story. While the Strickers were not previously known to the bank, without question, Keyton certainly was. Far from being some unknown, rogue employee of Almerica, *Keyton was Almerica*. From at least June, 1999, when it took a mortgage assignment from Almerica, Flagstar knew that Keyton was Almerica's president. Even a quick perusal of the public records of the State of Michigan, which Flagstar had to have (or should have) performed when it "approved" Almerica, disclosed that Keyton was the *sole* incorporator, *sole* registered agent, president and *sole* officer of Almerica.[7]

Keyton was also well known to Flagstar as the president of Keyton's Development. In 1999, Flagstar made a $170,000 loan to Keyton's Development, taking a mortgage on the Morgan Hills project. Since Keyton was the incorporator, registered agent, president,

---

[6] Throughout their testimony, Flagstar's witnesses, including Wilkie, attempted to convey the impression that Keyton was not well known to the bank. "[T]he firm would be approved through Flagstar but it's up to them [the firm] to approve or deny whatever loan officer they want to work for them." (Trans. at 264.) "He [Keyton] was a broker. He wasn't associated with us [Flagstar]." (Trans. at 324.)

[7] Although not introduced into evidence, because Flagstar took a mortgage assignment from Almerica in June, 1999, Flagstar's file must contain a corporate resolution or other corporate authorization allowing Keyton to execute the assignment as the "President" of Almerica. In addition, Flagstar had assigned one of its employees to act as its account executive to deal with Almerica and such account executives "do research on brokers before we [Flagstar] bring them on . . . ." (Trans. at 219-20 & 290.)

15

and sole officer of Keyton's Development, it is almost certain that Flagstar was well aware of Keyton.[8]

Keyton also had at least eight (8) direct and personal loans obtained from Flagstar. In 2002, Keyton arranged for the sale of the Strickers' Windcrest House to a third party for $394,000. Keyton accomplished this legerdemain by using a forged deed allegedly from the Strickers to Keyton's Development. Keyton then sold the property to a third party. The Strickers had no knowledge of either the deed or the sale. The Strickers received zero from Keyton's subterfuge. However, Keyton acquired a $275,000 check payable to Flagstar from this deceitful transaction. Although Keyton paid these ill-gotten funds to Flagstar, Keyton apparently instructed it to apply the funds to satisfy *his personal loans* that he had with Flagstar.

Although the full extent of the business relationships between Keyton and Flagstar is probably impossible to know, within the record in this case, one can easily discern (1) that Keyton (as Almerica) was making mortgage loans and then assigning them to Flagstar; (2) that Keyton was originating loans (as Almerica) for Flagstar; (3) that Keyton was borrowing (as Keyton's Development), without much question, directly from Flagstar; and (4) that Keyton had at least eight personal loans with Flagstar. Keyton was an established customer of Flagstar and Keyton was a known loan originator for Flagstar.

Flagstar knew that the Strickers, at the time the loan was closed, had made no down payment on the lot in Morgan Hills and had made no payment toward the construction

---

[8] The $170,000 loan during November, 1999 was a direct transaction between Flagstar and Keyton's Development. The Strickers had no involvement whatsoever in that loan. However, that loan gave Flagstar an economic interest in the success of the Morgan Hills project where the Windcrest House was located.

costs. Flagstar was also aware that Keyton, as Keyton's Development, was the seller of the lot and was owed $75,000 for that lot. Keyton executed the buy-sell agreement as the "president" of Keyton's Development. (Exh. 4.) Flagstar was further aware that Keyton (as "K.D.C. Builders") was to construct the Windcrest House. Keyton signed the construction agreement as the "president" of the "builder." (Exh. 32.)[9]

Given the totality of the facts and documents, Flagstar was aware that virtually all of the loan proceeds would go to Keyton, under one corporate guise or another. This is what happened. No funds from this loan were retained by the Strickers.

It is odd that no employee of Flagstar ever bothered to meet with or talk to the Strickers. Flagstar's only dealings with the Strickers were solely through Keyton. Keyton was the originator of the loan. Keyton supplied all additional documents in connection with the loan. Keyton was the sole representative of Flagstar at the closing of the loan. Keyton was the sole person responding to Flagstar in connection with post-closing matters. As Keyton, in one guise or another, was known to Flagstar as the beneficiary of the loan proceeds, the court believes that Flagstar was relying totally upon Keyton, and not the Strickers, in making this loan.

The court can only speculate why Flagstar approved a loan when its own representative in originating, documenting, and closing the loan was to receive virtually all of the loan proceeds. Perhaps Flagstar was concerned about the success of the Morgan Hills project for which it had directly loaned funds to Keyton's Development and upon which it still held an outstanding mortgage. Perhaps because of its multiple business

---

[9] "K.D.C." very probably is "Keyton's Development Corporation." This is supported by the fact that the building permit for the Windcrest House which Flagstar had in its file states the "contractor" as "Keyton's Development." (Exh. 40.)

relationships with Keyton, Flagstar was willing to make a loan where the loan originator was to receive the funds. Perhaps the large number of Flagstar's relationships with Keyton gave rise to some type of "special relationship" between them. Perhaps the whole transaction is just an example of the greedy easy-money loan-now-ask-questions-later mentality of the market place at that time.[10] Whatever Flagstar's motivation, it was willing to make this loan for Keyton. In doing so, Flagstar ignored numerous red flags and relied upon documents (mostly concocted by Keyton) that would not have fooled a literate high school student.

First, even assuming Keyton was not to be the sole recipient of loan proceeds, the loan application process was unusual. The original 1999 loan application requested a $233,900 loan. For unexplained reasons, this loan, though approved, never closed. A year and one-half later, Flagstar received an unsigned second loan application from Keyton, allegedly on behalf of the Strickers, requesting a $320,000 loan. Flagstar, after running the application through its "engine," turned down the loan application on February 1, but invited Keyton to submit another loan application for a smaller loan. Then, within six days, Flagstar approved and closed a $275,000 loan. Therefore, one may easily conclude that Flagstar believed it was dealing with borrowers who thought they needed a

---

[10] In 2001, Flagstar, as one of the country's largest residential lenders, was making as many loans as possible so that it could "securitize" them and sell them to investors. This was Flagstar's plan in connection with the Stricker loan. As the bank's witness testified, he processed the loan through the loan evaluation "engine" to ensure, after construction, that "an investor . . . can take this loan once it modifies." (Trans. at 235-36.) Flagstar was concerned with the ultimate marketability to "package" the loan rather than the responsibilities of the borrowers and the broker. See notes 18-22 and text below.

$233,900 loan in 1999, then a $320,000 loan on February 1, 2001, then were satisfied to accept a $275,000 loan on February 6, 2001.[11]

There is no showing that the Strickers were even aware of the $320,000 loan application. Flagstar's credit denial was sent to Keyton and not to the Strickers. As Flagstar's employee testified: "It was faxed to the correspondent's name where Mr. Keyton worked at and was not sent to the Strickers." (Trans. at 242.)

Flagstar's credit denial of the $320,000 loan, with an invitation to loan a lesser amount, generated a flurry of activity between Flagstar and Keyton. The Strickers were not involved in this activity. Flagstar requested and received numerous supplemental documents between February 1 to February 6 such that it could resubmit a $275,000 loan to its "engine." This would allow Flagstar to market the revised loan to an investor. Keyton, as the person who would benefit from the loan, was happy to oblige by inventing and delivering to Flagstar a number of documents (of which the Strickers were totally unaware). Many of these supplemental loan documents allegedly relied upon by Flagstar are, on their face, unusual and, in some instances, border on the bizarre.

Because the Strickers earned moderate income (as a nurse and a draftsman), Flagstar's mortgage valuation "engine" required that the Strickers' two existing mortgage debts (the mortgage held by Flagstar on the Lansing Property and the mortgage on their home in Lake Ann, Michigan) be "offset" by some extraordinary income so that the debt-to-

---

[11] At the time Flagstar approved the $275,000 loan, on February 6, it had *no* loan application signed by the Strickers. The $320,000 loan application had not been signed by anyone although there was a typed signature of Keyton. The $275,000 loan application was not signed by the Strickers until February 7, one day *after* Flagstar had already approved the loan. One can only conclude that Flagstar approved the modified loan at *Keyton's request.*

income ratio required by Flagstar's "engine" would be satisfied. Keyton accomplished this by furnishing to Flagstar three totally fictitious leases, two for the Lansing Property and one for the Strickers' Lake Ann home. Flagstar accepted these bogus leases without question or investigation. These "leases" were, on their face, ridiculous. Again, one may discern that the ultimate ability to "package" the mortgage motivated Flagstar to grant the loan.

Each of the purported leases are on the same form of less than one page. Each one contains six paragraphs. To say that the leases are simplistic documents is beyond question. The purported leases did not have any provisions concerning the maximum number of occupants, have no provisions requiring insurance, have no provisions relating to subletting, have no provisions relating to pets, have no acknowledgment of the condition of the premises, have no provision for access to the landlord, have no provision for responsibilities to repair the property if it became untenable, and have no provisions relating to the right of either the lessor or the lessee to terminate the lease.[12]

Even more telling, Flagstar knew from its mortgage on the Lansing Property, that Tammy Stricker was a joint owner of the property. Neither of the bogus Lansing leases contain a reference to Tammy Stricker. She is not listed as a landlord and there is no signature line for her as a lessor of the Lansing Property.

The purported lease on the Strickers' residence in Lake Ann is, if anything, even more mysterious. In addition to having all of the obvious deficiencies of the two bogus Lansing Property leases, the Lake Ann lease describes an alleged arrangement, which

_____

[12] Flagstar *did* have in its file a 1996 lease of the Lansing Property which the two bogus leases were allegedly replacing. In contrast to the newly-created fake leases, the 1996 lease is a normal lease document. It is four pages long, with 32 paragraphs, and contains all of the standard provisions one normally finds in a real property residential lease. (Exh. 46.) Of course, it is also signed by both of the co-owners, as landlords.

20

appears to be unique under any circumstances. The lease contains a "SPECIAL CLAUSE" as follows: "LANDLORD AND FAMILY WILL ALSO OCCUPY PROPERTY UNTIL LANDLORDS' NEW HOME IS BUILT. (APPROXIMATELY 5-1-2001.)" The purported lessees, therefore, allegedly were paying the full rental of $900 per month to the Strickers, *although the Strickers were continuing to live in the house and had no firm date to vacate.*

None of these abnormal provisions raised any questions by Flagstar. Apart from any Flagstar communications with Keyton, no representative of Flagstar contacted either the Strickers or verified any of the fictitious leases, e.g., the purported lessees were not contacted.

Flagstar also inserted a "condition" in its Loan Purchase Commitment stating that it needed "lease agreement for next 12/mo for 2840-42 Skyway [Lansing Property] . . . ." (Exh. 31, emphasis added.) Neither of the purported Lansing Property leases met that "condition." However, for unknown reasons, Flagstar subsequently waived this condition.

Flagstar's witnesses testified that it was "crucial" that the Strickers pay between $80,000 and $91,000 of their own money at closing. To satisfy this requirement, Keyton, without involvement of the Strickers, manufactured other documents including the so-called "gift letter" and the Verification of Deposit purportedly from Old Kent Bank. The purported "gift letter" is another homemade, one-page document allegedly executed by the grandmother of one of the Strickers agreeing to give the Strickers $35,000. Of course, this document was totally fictitious. The person who signed it was not a grandmother of either of the Strickers. Apparently this did not concern Keyton because he correctly assumed that Flagstar would make no effort to confirm the authenticity of the fake document if it supported the proper result by Flagstar's loan "engine."

21

The Verification of Deposit (Exh. 34) is an even stranger document. It is on a customary Fannie Mae form and purports to have been completed by Old Kent Bank. It was submitted to Old Kent Bank by "Diane Keyton" who is described as the "office manager" of Almerica. The "Information To Be Verified" asked Old Kent to verify that the Strickers had a savings account with a balance of $10,883.66. However, Old Kent Bank then purportedly verified that the same account actually had a much greater balance in the amount of "$63,815.24." To credit this document, one would have to believe that the Strickers were completely mistaken about the money they had in their own savings account, and that they actually had a balance six times greater than the amount requested to be verified.

More importantly, because banking institutions routinely decline to release information about the balances of their customers without adequate authorization, there are signature lines on the verification form for both Strickers to execute. However, these *signature lines are blank*. To credit this document, one would have to believe that Old Kent Bank released the Strickers' deposit account information without their written authorization.

Of course, the Verification of Deposit was another fraudulent invention of Keyton. In spite of its patent peculiarities, again Flagstar made no effort whatsoever to verify the authenticity of Keyton's submission.

Flagstar also required of Keyton a "Satisfactory Appraisal by a Flagstar approved appraiser for at least $356,000." (Exh. 31.) Again, Keyton was happy to oblige and furnished an appraisal of *exactly* $356,000 dated July 14, 2000 purportedly from a Ronald D. Reamer of Veri-Tech Appraisal. (Exh. 33.) There are at least two glaring discrepancies in this appraisal. First, although the evaluation letter which is page one of the appraisal

22

values the property at $356,000, there is a second valuation letter, four pages later, with the same date for the same property and signed, allegedly, by the same appraiser valuing the property at $308,000.  Flagstar's two witnesses attempted to explain this as either a "typo" or made the "assumption" that the $308,000 value was regarding the wrong set of plans. This is pure speculation as Flagstar *never checked with the appraiser to obtain an explanation of this obvious problem*.  A $308,000 valuation would not have supported a $275,000 loan.

In addition, the Windcrest House is part of a condominium project.  The appraisal, however, is inexplicably unclear about the type of property the appraiser thought he was evaluating.  In the pre-printed "ADDENDUM," the appraisal refers to the property as a Site Condominium, but in the detailed Uniform Residential Appraisal Report section, the appraisal refers to the property as "Fee Simple" rather than as a "Condominium."[13] Further, the appraiser did not include in the appraisal any condominium sales as comparables.  All of his comparables were "Fee Simple" properties.  Although another highly visible red flag was waved, Flagstar made no attempt to obtain an explanation from the appraiser.[14]

Flagstar's Loan Purchase Commitment also required that it receive a signed Escrow Acknowledgment and a signed Construction Loan Draw Agreement.  Keyton utilized an Escrow Acknowledgment dated December 2, 1999 and a Construction Loan Draw

---

[13] The bank's witness was likewise confused about whether this was a condominium or a fee simple property.  He mistakenly testified that it was not a condominium *by looking at the appraisal*.  The confusion of the witness appears illustrative of the inattention of Flagstar regarding this loan.

[14] This is inconsistent with Flagstar's loan approval process.  Flagstar's witness stressed that the "*most important*" information in the appraisal is the description of "what *exact type of property we have* and *what type . . . of comparables we have* to support that value." (Trans. at 305, emphasis added.)

23

Agreement dated July 15, 1999. These documents obviously had not been executed in connection with the current loan application. Both prior documents had been submitted to Flagstar over a year earlier, in connection with the different $233,900 loan application. This should have been yet another red flag in Flagstar's files. However, Flagstar failed to check whether these documents were still effective. Flagstar cleared this condition without further investigation.

Another Flagstar condition in its Loan Purchase Commitment was that the cost to build ($281,000) and the lot price ($75,000) be documented. This was done by Flagstar relying upon the Building Construction Agreement ("BCA") furnished to Flagstar by Keyton. Keyton signed the BCA as "president" of the builder. The BCA is dated October 23, 2000 and is "contingent" on the buyer receiving a loan commitment for $320,000 with a conventional mortgage. Also, the $281,000 building cost was to remain fixed only if the financing was obtained "on or before 1-31-2001." Neither of these contingencies occurred which calls into doubt the continuing validity of the BCA. Ignoring another red flag, Flagstar did not require an amended construction agreement and cleared its conditions.

Flagstar also had a number of "conditions" that "MUST BE COMPLIED WITH AT CLOSING." (Flagstar Exh. 31.) Although it was allegedly crucial to comply with these "conditions," Flagstar sent no one, except Keyton, to the closing.

Two of the closing conditions were (1) that Flagstar receive "proof" of the pay off by the Strickers of certain debts they owed to third parties; and (2) that there were to be "NO FURTHER DRAWS WITHOUT DOC. THAT THESE DEBTS HAVE BEEN PAID." The

24

specified debts were never paid and Flagstar, without any proof of payment, waived the condition.[15]

Another "condition" which "MUST BE COMPLIED WITH AT CLOSING" was that Flagstar receive "COPY OF TRUE CERTIFIED CHECK FOR $35,000 TO DOC. GIFT." This seems to be an important condition. The highly suspect gift from grandmother (yet another red flag) should be verified. No copy of a certified check was introduced into evidence since the alleged gift was a total fabrication of Keyton. As Flagstar's witness testified, "They *should* have given us a copy of the certified check." (Trans. at 359, emphasis added.) Yet again, the lack of the certified check did not stop Flagstar from ignoring its own condition and funding Keyton's loan.

Another closing "condition" was that Flagstar hold the first and only lien. The bank waived this based on a First Lien Letter ("Lien Letter") from the title company. (Exh. 43.) However, paragraph 1 of the Lien Letter incorrectly stated that the loan proceeds at closing had been "COMPLETELY DISBURSED . . . IN THE AMOUNT OF $275,000." As Flagstar was aware, this statement was wrong. The loan proceeds were not fully disbursed for some months. Flagstar accepted the erroneous Lien Letter and again waived a condition.

---

[15] Flagstar's witness testified that he waived this condition because he had received the signed HUD Settlement Statement (Exh. 28) which indicated to him that these debts had been paid. That settlement statement was signed at closing on February 7, 2001. However, the Loan Purchase Commitment, on which the bank waived the condition (by typing "NONE" next to it), was prepared on February 6, *one day before closing*. In addition, the witness' explanation is circular. He claimed Flagstar was requiring "proof" that the Strickers had paid certain debts because their loan application stated that those debts would be paid. Then he says that he accepted as "proof" of payment another document signed by the Strickers. In other words, one document, purportedly from the Strickers, allegedly caused the bank to ask for independent verification of the payment and then Flagstar accepted as such independent verification another document from the Strickers. The court believes that Keyton and Flagstar orchestrated this waiver to successfully drive the loan "engine" forward.

The $275,000 *unsigned* loan application faxed to Flagstar on February 2 contained misstatements which Flagstar had to know were not accurate. The application states that the Strickers' Lake Ann residence was subject to an $87,204 mortgage held by Flagstar. However, Flagstar had no outstanding loan to the Strickers on their Lake Ann residence. Flagstar knew that it did *not* have a mortgage on that residence. Regardless, Flagstar accepted the loan application, ignoring another bright red flag.

One must conclude that Flagstar was in a rush to make this loan. Between February 2 and February 6, it worked constantly with Keyton, and only with Keyton, to structure a loan that Flagstar could successfully run through its "engine." On February 2, Keyton faxed to Flagstar an unsigned $275,000 loan application, the three bogus leases, the commitment for title insurance and the $356,000/$308,000 appraisal. Sometime between February 2 and February 6, Keyton also supplied Flagstar with the "gift letter," Verification of Deposit, the Building Construction Agreement and the February 6, 2001 flood plain certificate. All of these and other related documents were blindly used by Flagstar so the loan could be closed and funded on February 7, 2001.

Another indication of Flagstar's haste is supported by a review of its Loan Purchase Commitment of February 6, 2001. It is riddled with errors. It stated that the "Borrower's cash used for closing" was to be "$0.00." The bank's witness admitted that this was in error because he had just testified that it was "crucial" for the Strickers to bring between $81,000 and $90,000 to the closing. (Trans. at 337.)

The loan purchase commitment also required "PMI Disclosure (DOC. 3660) must be signed by all borrowers."[16] Another condition also dealt with mortgage insurance and

---

[16] "PMI" stands for Personal Mortgage Insurance.

required that one month's premium be paid at closing. Flagstar's witness admitted that this was also a mistake, because no mortgage insurance was required. Yet again, another Flagstar error occurred in processing Keyton's loan documents.

Even if Flagstar had not known that this loan was for the benefit of Keyton, the documents Keyton supplied should have put Flagstar on notice that there was something terribly wrong with this transaction. The court believes that to assertedly rely upon documents when they are furnished by the same person who is receiving the loan proceeds without adequate independent review, is negligence (and probably gross negligence) on the part of Flagstar.

Under the circumstances described above, could Flagstar's reliance here have been "justifiable," or "reasonable?" The answer is "no." Both the Supreme Court and the Court of Appeals for the Sixth Circuit have addressed the reliance requirements under § 523(a)(2)(A) and (B). The Supreme Court, in discussing the less onerous standard of "justifiable" reliance, and relying in significant part on the Restatement (Second) of Torts (1976), stated:

> Justifiability is not without some limits, however. As a comment to § 541 [Restatement of Torts] explains, a person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect . . . ."
>
> "[I]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should

27

> serve as a warning that he is being deceived, that he is
> required to make an investigation of his own."

Field v. Mans, 516 U.S. 59, 70-71, 116 S.Ct. 437, 444 (1995) (citations omitted).

The Court also adopted the following language from Prosser and Keaton on Torts, "[t]he matter seems to turn upon an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case." Field v. Mans, 516 U.S. at 72, 116 S.Ct. at 444 (citation omitted).

Flagstar is a large national bank and an experienced mortgage lender. It was evaluating a situation where the person who was originating the loan for it, who had supplied it with all the information regarding such loan, and who closed the loan, was the same person it knew, in one capacity or another, would receive virtually all of the loan proceeds. That, in and of itself, is one giant red flag.

In totality, the documents are rife with errors and misstatements obvious to anyone, much less an experienced national bank. Without question, any combination of these errors is sufficient to serve "as a warning that he is being deceived, and that he is required to make an investigation of his own." Field v. Mans, 516 U.S. at 71, 116 S.Ct. at 444.

The Sixth Circuit, in examining the concept of "reasonable" reliance has stated:

> Whether a creditor's reliance was reasonable is a factual determination to be made in light of the totality of the circumstances. Among the circumstances that might affect the reasonableness of a creditor's reliance are: (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5)

28

whether even minimal investigation would have revealed the
inaccuracy of the debtor's representations.

BancBoston Mortgage Corp. v. Ledford (In re Ledford), 970 F.2d 1556, 1560 (6th Cir.
1992).

Flagstar had no close relationship with the Strickers (although it had a very close
relationship with Keyton and relied upon him completely).  Flagstar knew, or should have
easily perceived, that Keyton was the true beneficiary of the requested loan.[17]

There was no relationship of trust between Flagstar and the Strickers.  Throughout
the entire loan transaction, Flagstar never once met with or spoke to the Strickers except
through its representative, Keyton, the true beneficiary of the loan.  There were numerous
"red flags" that would have alerted an ordinary prudent lender that something was amiss.
Even the most minimal investigations would have shown that the representations allegedly
relied upon by Flagstar were inaccurate and that virtually all of these representations and
manufactured false documents came from Keyton.

---

[17] Flagstar's witnesses admitted that its system of making mortgage loans was
designed so that it put unquestioned reliance upon Keyton, as the "loan officer" or "broker."
The "broker will act as a loan officer and fill the application . . . ." (Trans. at 263.) "Again,
from the underwriting standpoint, we don't determine that everything is to be signed.
That's more for the closers . . . ." (Trans. at 234.) "We relied more on the broker to make
sure we had the correct information." (Trans. at 264.) "Well, basically I guess when we
have our approval process, you know, for the broker, we already have the broker approved
and we are under the assumption of the documents they're providing that's coming from
the borrower is accurate." (Trans. at 273.) "From an underwriting standpoint, we do not
interact with borrowers at all." (Trans. at 302.) "I haven't received any [information] from
the borrowers, I received it all from Almerica Mortgage Corp." (Trans. at 303.) "Once
again, everything would come from *the broker, the loan officer*.  They're the ones -- you
know the borrowers don't send stuff to us." (Trans. at 366, emphasis added.)

Flagstar relied upon its business associate, Keyton, not the Strickers. To the extent Flagstar relied on *anything* the Strickers did, Flagstar's reliance was neither justifiable nor reasonable.

E.     Proximate Cause.

The Sixth Circuit has mandated that under § 523(a)(2)(A) the creditor must prove that "its reliance was the proximate cause of [the] loss." Rembert v. AT&T Universal Card Services, Inc. (In re Rembert), 141 F.3d 277, 281 (6th Cir. 1998); Atassi v. McLaren (In re McLaren), 990 F.2d 850, 852 (6th Cir. 1993). The loan applications here were not the proximate cause of Flagstar's loss. In June 2002, Keyton forged a deed from the Strickers purportedly conveying the Windcrest House back to Keyton's Development. The Strickers had no knowledge of the deed. In November 2002, Keyton sold the Windcrest House to a third party for $394,000. The Strickers had no knowledge of the sale and received nothing from it. Through this sale, Keyton acquired a $275,000 check that was to be used to pay the Strickers' mortgage debt to Flagstar on the Windcrest House. Keyton paid the $275,000 to Flagstar but, apparently, instructed Flagstar to apply the funds to Keyton's Personal Loans. Flagstar did so and so the Strickers' mortgage remained unpaid. *It was Keyton's and Flagstar's misapplication of the $275,000 payment, and not anything that went before, that was the proximate cause of Flagstar's loss.*

The bank seems to desire to make a multiple recovery. It certainly wants to keep the $275,000 which it applied on Keyton's Personal Loans (and which should have satisfied the Strickers' mortgage). Also, Flagstar, in the Michigan state court, established the continuing priority of its mortgage in the Windcrest House and foreclosed upon the mortgage thereby recovering funds. Flagstar (and the Strickers) has a restitution debt

30

owed by Keyton to it which may ultimately be paid.    Flagstar now seeks a nondischargeable debt judgment to require the Strickers to pay a deficiency judgment on the mortgage foreclosure.  It was the fraud of Keyton which was the proximate cause of Flagstar's loss.  Flagstar has failed to prove a requisite element.

## V.  CONCLUSION.

Some now believe our nation is (or was) mired in its worst economic crisis since the Great Depression.[18]   The current economic catastrophe was precipitated, in part, by millions of imprudent mortgage loans made by lenders, such as Flagstar, through numerous mortgage brokers with whom the lenders had created relationships.[19]  As illustrated in this adversary proceeding, many banks and mortgage lenders abandoned any notion of normal safe and sound lending practices because, immediately after the closing of loans, they would sell or package the mortgages, often through mortgage securitizations,

---

[18] "The outline of the origin and trajectory of the current financial crisis, *clearly the worst financial meltdown since the Great Depression*, are well known."  James Crotty, Structural Causes of the Global Financial Crisis: A Critical Assessment of the 'New Financial Architecture' at 3 (Political Econ. Research Inst., Working Paper Series, Paper No. 180, 2008) (emphasis supplied) (hereinafter "Crotty").  "The problems in the mortgage market are routinely referred to as a 'foreclosure crisis' because the level of defaults and foreclosures greatly exceed previous peak levels in the post-war era and, as a result, have drawn *comparisons to the levels of distress experienced in the Great Depression.*"  U.S. Department of Housing and Urban Dev., Office of Policy Dev. and Research, Interim Report to Congress on the Root Causes of the Foreclosure Crisis, (2009) (emphasis supplied) Executive Summary at vii (hereinafter "HUD Executive Summary").

[19] One analyst "has concluded that most fraud is driven by *mortgage brokers* in their efforts to earn profits by originating loans.  Existing information further suggests that the vast majority of fraud involves the misrepresentation on loan applications related to income, employment, or occupancy of the home by the borrowers.  HUD Executive Summary at xi (emphasis added).  "Another significant share of cases of fraud involve appraisal misrepresentations, where property conditions are materially different than presented in the appraisal or information that is typically outside accepted parameters used to derive property values."  Id.

to "investors" at a profit.[20]   Now that the dancing at the banks and the Wall Street music has been temporarily stopped by the current financial crisis, this judge is concerned that when some borrowers are forced into bankruptcy because of imprudent loans, the same profit-focused lenders, or their assignees, will decide to "nit pick" the loan applications *created by themselves and their brokers* and seek to hold lower and middle class borrowers solely accountable.[21]   Banks, who relied on the brokers, so both would make a healthy profit, should not be permitted to spin the facts and later claim that ordinary, financially strapped citizens were attempting to defraud them.

The mortgage lenders (and others) invented a system (Flagstar's "engine") where the more loans they made and immediately turned around and sold, the more money they

---

[20] Securitization involves transferring a loan or pool of loans into a trust and then having that trust issue securities, or bonds, that are rated by the large rating agencies and purchased in the institutional bond market." Ethan Penner, The Future of Securitization, Wall Street Journal, July 10, 2008, at A15. Securitization appealed to many banks over "portfolio lending, where the banker held an originated loan to maturity," and "the bank remained on the hook for any losses during the life of the loan." Id. Securitization is a "key culprit of the housing mess because banks created and then sold billions of dollars of securities without conducting due diligence on individual loans within the pools." Liz Rappaport & Carrick Mollenkamp, Crisis on Wall Street: Banks May Keep Skin In the Game, Wall Street Journal, February 10, 2009, at C3. Some banks appear to have encouraged loans "due to the high profits associated with originating these loans and packaging them for sale to investors." HUD Executive Summary at viii.

[21] Securitization dilutes the individual responsibility of participants. "The mortgage broker can easily become disconnected from the outcome of the initial lending decision." Vincent Reinhart, Securitization and the Mortgage Mess, Wall Street Journal, July 18, 2008, at A13. Brokers facilitate borrowers to match with banks who are willing to lend. Id. The bank then sometimes sells the mortgage to another entity that pools the mortgages into an asset-backed security. Id. The bank's incentive to "scrutinize the creditworthiness of borrowers" is reduced. Alan S. Blinder, Six Fingers of Blame in the Mortgage Mess, N.Y. Times, September 30, 2007, at 34 (hereinafter "Blinder").

"earned."[22] Lenders such as Flagstar abandoned even the pretense of knowing a borrower or relying upon a specific borrower's statements. The mortgage lenders almost exclusively depended upon mortgage brokers to sell their "products" to almost anyone. Under these types of circumstances, bankruptcy courts should undertake a careful and precise review of lender nondischargeability claims arising out of a flawed system created, or at least ratified, by those plaintiff-lenders.

Flagstar has failed to prove all requisite elements to establish a nondischargeable debt under 11 U.S.C. §§ 523(a)(2)(A) or 523(a)(2)(B) of the Bankruptcy Code. Flagstar's nondischargeability claims against the Strickers are dismissed, with prejudice. The court will enter a separate order in accordance with this opinion.

Dated this 30th day of September, 2009
at Grand Rapids, Michigan

Honorable James D. Gregg
Chief United States Bankruptcy Judge

---

[22] "[B]anks and mortgage brokers originate loans and sell them quickly to a big financial firm that 'securitizes' them . . . . These 'mortgage-backed securities' are then sold to investors worldwide, to people who have no idea who the original borrowers are." Blinder at 34. Securitization "rained down fee income throughout the system" including to the mortgage brokers and the banks giving a strong incentive "to maximize the flow of loans through the system - whether or not they were sound." Crotty at 17. Record "spectacular profits" from "high risk strategies" were not uncommon. Crotty at 18.